Judge Garnett

24 CV 07245

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NRD GP LLC, and NEBULA RESEARCH & DEVELOPMENT LLC, | |
| *Plaintiffs,* | Civil Action No.: _____ |
| v. | **JURY TRIAL DEMANDED** |
| CENTIVA CAPITAL, LP; | |
| *Defendant.* | |

## COMPLAINT

Plaintiffs NRD GP LLC ("NRD GP"), and Nebula Research & Development LLC ("NRD") (collectively, "Nebula"), by and through their undersigned attorneys, hereby allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## SUMMARY OF THE ACTION

1. This action is brought to remedy Centiva Capital, LP's ("Centiva") efforts to capitalize on the untimely death of Michael Graves ("Mr. Graves"), a dean of the quantitative trading industry, and purloin Nebula's incredibly valuable and proprietary information. Centiva's success has come at the expense of Nebula, the quantitative trading firm that Mr. Graves founded.

2. Nebula developed quantitative trading strategies using trade secrets developed by Mr. Graves and various quantitative researchers and software developers that worked for Mr. Graves over two decades. Desiring to capture these trade secrets, without needing to undertake the years of research and development typically required, Centiva engaged in a dual track strategy.

1

3.    On one track, Centiva ███████████████████████████ ███████████████████████ and entered into ███████████ a non-disclosure agreement ("NDA") with Nebula's new management.    ████████████████, Centiva obtained highly confidential financial performance information related to Nebula's quantitative strategies.

4.    On the other track, Centiva simultaneously negotiated with Colin McCarthy ("Mr. McCarthy"), Nebula's former number two in command who had been terminated for malfeasance, to obtain Nebula's trade secrets illegally.

5.    Unknown to Nebula at the time and later revealed through forensic analysis, Mr. McCarthy had secured an "insurance policy" during his time at Nebula in the form of a trove of Nebula's trade secrets that he retained on electronic devices and in records. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

6.    When Centiva determined it could likely obtain Nebula's valuable trade secrets through Mr. McCarthy, Centiva abandoned the legitimate track and instead used confidential information provided by Nebula to validate McCarthy's statements about the value of the trade secrets he planned to steal from Nebula.

7.    Ultimately, Centiva hired Mr. McCarthy, stole Nebula's trade secrets, and continues to use and benefit from their use to this day.

**THE PARTIES**

8.    Plaintiff NRD, a Delaware limited liability company with its principal place of business in New York, New York, is an asset management firm that manages trading and investments for large institutional hedge funds.  NRD was founded by Mr. Graves, who indirectly owned 70% of the company through his 70% ownership of NRD's indirect parent, NRD GP.

9.      Plaintiff NRD GP is a Delaware limited liability company with its principal place of business in New York, New York, and the general partner of NRD's direct parent company, Nebula Research and Development Holdings LP.

10.      Defendant Centiva is a Delaware limited partnership with its principal place of business in New York, New York.  Like Nebula, it is an investment management firm that manages trading and investments for large institutional hedge funds.  Centiva is a direct competitor of Nebula.

11.      Non-Party Colin McCarthy is a former employee of Nebula and a current employee of Centiva.  Mr. McCarthy is not named in this action, but is the subject of separate proceedings to remedy his wrongful conduct.  Nebula seeks no relief from Mr. McCarthy in this action which is brought solely to remedy Centiva's theft of Nebula's trade secrets and breach of the NDA.

## JURISDICTION AND VENUE

12.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action involves a claim arising under the Defend Trade Secrets Act, 18 U.S.C. § 1832.  This Court has supplemental jurisdiction over Nebula's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the claim arising under federal law that they form part of the same case or controversy.

13.      This Court has personal jurisdiction over Centiva because its principal place of business is New York and because its actions underlying Nebula's claims were committed, in whole or in part, in New York County.

14.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to Nebula's claims occurred in this District.

## FACTUAL ALLEGATIONS

### The Nebula Trade Secrets

15.     Nebula is a quantitative trading firm.  It negotiates fixed fees to manage money for its clients and earns additional fees that are tied to its trading performance.  Nebula markets itself to clients and distinguishes itself from competing investment management firms by touting its trading performance.

16.     Nebula's equity and futures trading performance, in particular, is driven by its trade secrets.  Nebula's trade secrets take multiple forms, including but not limited to:

- Highly sensitive computer source code, byte code, and object code that comprises Nebula's automated trading system and is designed to manage a diverse long/short portfolio of thousands of publicly traded securities and to execute trades.

- Data sets that have been selected and identified by Nebula as having predictive power about the movement of securities' prices.

- Quantitative trading algorithms that are reflected in highly sensitive computer source code, byte code, and object code. These algorithms utilize the selected data sets to develop trading models, which are then combined to produce portfolios of securities, taking into account various constraints including risk and liquidity.

- Simulation results of various combinations of trading models that are used to identify combinations that produce high-return portfolios.

- Daily profit and loss information that is critical to evaluating the suitability of Nebula's quantitative trading strategies for clients, based on their expected return and risk tolerance.

17.     Nebula uses its highly complicated software, vetted data sets, algorithms, simulation data, and profit and loss information to successfully trade securities for the benefit of its clients.

18.     Most of Nebula's trade secrets were developed by Mr. Graves and a team of expert quantitative researchers and developers.  Nebula is the exclusive licensee of those trade

secrets.  In order to obtain and develop each of Nebula's trade secrets, significant amounts of human capital, money, and other resources were expended during the course of over 20 years.

19.     Nebula, in keeping with industry practice, is highly protective of its trade secrets and goes to great lengths to protect them from unauthorized use or disclosure.  Nebula maintained internal policies and procedures that instructed employees on appropriately using and safeguarding Nebula's trade secrets.  Nebula also required its employees to sign confidentiality agreements and agree to non-compete provisions in order to prevent the misuse or unauthorized disclosure of Nebula's trade secrets.

20.     To the extent any third parties required access to Nebula's trade secrets, Nebula required those third parties to sign confidentiality agreements in order to prevent misuse or unauthorized disclosure.

21.     Nebula imposes physical safeguards to protect and limit access to its trade secrets, including the use of secure and locked spaces that prevent unauthorized individuals from accessing the trade secrets.  Nebula also imposes electronic safeguards to protect and limit access to its trade secrets, including the use of network passwords, network monitoring, encryption, access control, and file control software.

22.     Nebula's trade secrets derive significant value from not being generally known or readily ascertainable.  That value has been diminished by Centiva's theft and continued use of those trade secrets.

**The History of Nebula**

23.     Nebula was founded in 2018 by Mr. Graves to deploy his decades of experience in the asset management industry.

24. Nebula obtained, developed, and deployed its trade secrets for the benefit of its clients. Within a few years of its founding, Nebula was managing over five billion dollars of regulatory assets under management (RAUM). Nebula's success was directly attributable to the trade secrets that it had obtained and developed.

25. Mr. Graves hired Mr. McCarthy to serve as Nebula's Chief Technology Officer and assigned Mr. McCarthy a 30% economic interest in Nebula. The governing documents, however, made clear that Mr. Graves was the managing member and had exclusive control over Nebula. These same documents imposed stringent confidentiality obligations on Mr. McCarthy, as well as a six month non-compete period following his termination from Nebula.

26. In January 2022, Michael Graves suddenly died at the age of 49.

27. Notwithstanding his purely economic non-voting interest, Mr. McCarthy saw Mr. Graves' death as an opportunity to further his own self-interest and set about to wrongfully seize control of Nebula's business for himself.

28. In the end, Mr. McCarthy did not succeed, and control of Nebula passed to his estate, benefiting his 12-year old twin children in accordance with Mr. Graves' will.

29. Upon learning of Mr. McCarthy's attempted coup and wrongdoing, Nebula terminated him on May 2, 2022. Separate proceedings are ongoing seeking to remedy McCarthy's misconduct which is not the subject of this action.

30. Following his termination, Mr. McCarthy **refused** to return Nebula-owned property including computers that were issued to him – materials that would be expected to contain Nebula's confidential information. As discussed below, Nebula later learned that these materials constituted Mr. McCarthy's "insurance policy" and that he planned to sell them to the highest bidder, which turned out to be Centiva.

**Centiva Engages In Discussions With Mr. McCarthy**

31.     On April 21, 2022, Mr. McCarthy created a new Gmail account, apparently for purposes of secretly carrying on discussions with Centiva regarding both new employment opportunities and Nebula's trade secrets.

32.     The next day, Mr. McCarthy emailed himself a copy of Nebula's governing documents and connected with Centiva's Chief Investment Officer and Head of Strategy Development – ███████████████████████████████████. On April 26, 2022, Mr. McCarthy performed internet research regarding Centiva's employees in an apparent exercise to see whether Centiva would be the right next move for him.

33.     On April 27, 2022, Mr. McCarthy confirmed a Zoom meeting with Centiva representatives scheduled for April 28, 2022.

34.     On April 28, 2022, in advance of Mr. McCarthy's scheduled Zoom meeting with Centiva, Mr. McCarthy coordinated a meeting with his colleagues at Nebula to discuss potential future opportunities. During those discussions, it was made clear that Nebula's trade secrets should be memorized so that they can be recreated later on. Although Mr. McCarthy recognized that Nebula's trade secrets were owned by Nebula (not him), he conducted himself in line with a mistaken belief during this time that Centiva could obtain those trade secrets and avoid legal challenges by simply claiming that the trade secrets were recreated from memory.

35.     On April 30, 2022, following his meetings with Centiva, Mr. McCarthy accessed a folder on the cloud storage service DropBox though it is unclear what specific files he accessed or uploaded. In order to protect confidential information (including Nebula's trade secrets), Nebula has a policy of prohibiting the use of personal Dropbox accounts on Nebula computers and has its network configured to enforce that policy.

36. ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████ This

was a feat that could and did only become possible for Centiva through its use of Nebula's trade

secrets.

### Centiva Initiates Discussions With Nebula

37. ████████████████████████████████████

████████████████████████████████████████████████████

██████████████

38. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

39.     Thereafter, Centiva executed an NDA which had an effective date of May

10, 2022. ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

## Centiva Strings Nebula Along and Misuses Its Information

40. 

41.

42.

43.

44.
That is because as explained below, Mr. McCarthy also improperly retained copies of Nebula's trade secrets relating to futures trading on electronic devices that did not even belong to him, but belonged to Nebula.

45. 

46.

**Centiva Hires Mr. McCarthy and Exploits Nebula's Trade Secrets that Centiva Improperly Obtained**

47.     On November 2, 2022—six months to the day after his termination from Nebula (the exact duration required under his non-compete obligation)—Mr. McCarthy "officially" joined Centiva. Discovery is expected to reveal whether Centiva respected Mr. McCarthy's non-compete obligations to Nebula during the course of the prior six months.

48.     Within months after Mr. McCarthy "officially" joined Centiva, he reportedly had a team of ten people focusing on U.S. equities, global equities, and futures trading—the very areas covered by Nebula's trade secrets that Mr. McCarthy took to Centiva. This extremely compressed timeline was only feasible because Centiva had the benefit of Nebula's trade secrets. It is impossible to independently develop, code and test quantitative trading strategies for multiple asset classes and countries, in such a compressed time frame.

49.     At the same time, Centiva appears to have sought to avoid attracting unwarranted attention. News reports from May 2023 note that Centiva is "quietly hiring." While Centiva publicly disclosed that it hired several individuals, it appears to have avoided making any public announcements regarding its most significant acquisition – Mr. McCarthy. Additionally,

10

Arvin Soh, Head of Strategy Development at Centiva, also quietly reached out to Nebula's former head of futures trading aiming to recruit him to manage the misappropriated futures IP. Upon information and belief, Centiva may have contacted other employees from Nebula as well.

50.    Centiva continues to misuse Nebula's trade secrets, including its curated set of specific data vendors. For example, in September 2023, one of Nebula's data service providers mistakenly emailed Mr. McCarthy at his former Nebula email address to discuss working with Mr. McCarthy. The work was related to the provision of certain data sets to Centiva.

**Forensic Evidence Confirms Mr. McCarthy Took Trade Secrets To Benefit Centiva**

51.    In connection with his prior role as Chief Technology Officer of Nebula, Mr. McCarthy required extensive access to Nebula's trade secrets. However, during the time leading up to his termination, Mr. McCarthy used this access not to fulfil his duties as Nebula's Chief Technology Officer, but instead to improperly obtain Nebula's trade secrets to directly benefit his new employer, Centiva.

52.    Nebula learned the full extent of Mr. McCarthy's misconduct only after Nebula terminated him. For example, Nebula learned that immediately after Mr. Graves' passing, Mr. McCarthy was complicit with an ex-Nebula consultant who broke into **a safe and one or more locked filing cabinets** that were located at Nebula's offices in order to steal valuable contents and property stored within them, including, upon information and belief, cash that Mr. Graves had stored in the safe. **During this same time frame, the electronic hard drive from Mr. Graves' office computer went missing.**

53.    Nebula also discovered that its insider threat detection software (designed to monitor and safeguard Nebula's trade secrets) had not been installed on the Nebula computers that Mr. McCarthy used from home and his account was the only one that was excluded from

11

monitoring in the office network, even though that software was used on devices of all other Nebula employees. This allowed Mr. McCarthy to circumvent security restrictions that safeguarded Nebula's trade secrets.

54.    Upon Mr. McCarthy's termination, Nebula also asked Mr. McCarthy to return all property that belonged to Nebula, including a desktop and laptop computer that were owned by Nebula. Mr. McCarthy resisted, but eventually returned those computers to Nebula in August 2022 after repeated follow-up requests with his lawyer.

55.    Upon receiving the computers from Mr. McCarthy, Nebula uncovered further misconduct. With respect to Mr. McCarthy's desktop, Nebula discovered that it improperly contained Nebula's trade secrets, including (i) Nebula's profit and loss information, (ii) simulation files that reflected Nebula's quantitative trading strategies, and (iii) vendor data contracts of specific data sets that Nebula had identified as having important value. Mr. McCarthy had improperly retained these trade secrets on his desktop computer *even after* his employment with Nebula was terminated. Even more concerning is the fact that in many cases, these trade secrets were further accessed or downloaded *after* Mr. McCarthy had submitted a formal resignation letter to Nebula – a period of time during which he had no reason to be accessing or downloading such trade secrets at all.

56.    With respect to Mr. McCarthy's laptop computer, Nebula discovered that Mr. McCarthy had wiped his operating system "profile" (and all associated files) on or around June 1, 2022—in the midst of his discussions with Centiva, and *just days before* Mr. McCarthy turned that same laptop over to his lawyer for review and preservation—apparently in an effort to hide any evidence that Mr. McCarthy had improperly transferred Nebula's trade secrets to benefit himself and Centiva.

12

57.     Even more concerning, there is piecemeal forensic evidence that indicates that Mr. McCarthy may have connected external storage devices to ***both*** of these computers during this critical time frame, presumably to further transfer and use Nebula's trade secrets.  Despite this evidence, Mr. McCarthy insists that no such external storage devices exist.

58.     Given the circumstances, including (i) evidence found on Mr. McCarthy's desktop computer; (ii) evidence that Mr. McCarthy connected external storage devices to his laptop computer, (iii) the circumstances of his departure from Nebula, and (iv) ████████████ ████████████████████████, Mr. McCarthy's laptop computer may have contained Nebula's trade secrets, including its software, vetted data sets, algorithms, simulation data, and/or profit and loss information.  However, Mr. McCarthy has permanently destroyed evidence on his laptop computer thereby forever preventing Nebula from conclusively confirming which trade secrets were improperly retained on that device.

59.     Mr. McCarthy also improperly retained records that reflected Nebula's trade secrets, including (i) Nebula's quantitative trading strategies, and (ii) specific data sets that Nebula had relied on in developing its trading strategy and had identified as having important value.

\*     \*     \*

60.     Nebula has been injured by Centiva's theft of its trade secrets.  Both Nebula and Centiva ***directly*** compete in the asset management industry.   Centiva's construction of quantitative trading strategies by its improper reliance on Nebula's trade secrets has given it an unfair "head start" and allowed it to compete with Nebula head on.  There is even no certainty that an independent person or company could have developed equally effective trading strategies at all. Nebula markets itself to clients and distinguishes itself from competing investment management

firms by touting its performance that only the Nebula trade secrets enable. Now that Centiva operates, in essence, copycat trading strategies, potential investors cannot benefit from the deployment of Nebula's unique and proprietary trading strategies and have less reason to opt for Nebula. Nebula is less able to compete in the market.

61.    That Mr. McCarthy provided Nebula's trade secrets to Centiva is amply supported, including by: (i) Mr. McCarthy's communications with Centiva ███████████████ ████████████████, (ii) the steps taken by Mr. McCarthy to acquire and retain Nebula's trade secrets and then carry out this plan while covering his tracks, (iii) ███████████████████ ████████████████████████████████████████████, and (iv) Centiva's immediate hiring of Mr. McCarthy into a position which enabled him and Centiva to directly exploit the trade secrets that had been stolen from Nebula.

62.    That conclusion is further supported by Centiva's rapid build out of a large team led by Mr. McCarthy that was focused on U.S equities, global equities, and futures trading. Within just five months, Mr. McCarthy apparently began trading U.S. equities, and expanded quickly into trading futures and equities in foreign countries. It is impossible for a quantitative portfolio manager to begin trading all of these products within that period of time given the time, effort, and expense required to independently develop or obtain intellectual property such as software, vetted data sets, algorithms and simulation data – indeed, Mr. Graves and his team of quantitative researchers and developers spent more than two decades painstakingly engaged in developing such trade secrets from scratch. That short timeline of Centiva was only possible with the head start that Centiva illegally received in the form of Nebula's trade secrets.

63.    Centiva was on notice and aware of Mr. McCarthy's confidentiality obligations to Nebula, including because (i) Mr. McCarthy told Centiva about his employment

obligations at least in connection with explaining why he could not begin work at Centiva until his non-compete with Nebula expired; (ii) as an asset management company operating in an industry where confidentiality is necessarily highly prized, Centiva was aware that it is standard procedure for asset management companies like Nebula to protect its trade secrets through confidentiality and non-disclosure agreements; (iii) ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████; and (iv) ████████████████████████████████████████████ ████████████████████████████.

15

## FIRST CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832)

64.    Nebula repeats and re-alleges each and every allegation contained in paragraphs 1 through 63 of the Complaint, as if fully set forth herein.

65.    Nebula's trade secrets include, as described above, software, vetted data sets, algorithms, simulation data, and/or profit and loss information.  Those trade secrets are closely guarded and derive both actual and potential economic value from their confidentiality. They thus constitute trade secrets within the meaning of 18 U.S.C. § 1832.

66.    At all relevant times, Nebula has taken reasonable measures to protect the confidentiality of its trade secrets described above.

67.    Centiva received the Nebula trade secrets from Mr. McCarthy and relied upon Nebula's trade secrets to build its quantitative trading strategies and did so knowingly and without Nebula's express or implied consent.

68.    Centiva knew that Mr. McCarthy had legal duties and obligations prohibiting him from disclosing or using Nebula's trade secrets.

69.    Centiva's receipt of Nebula's trade secrets from Mr. McCarthy and reliance on those secrets for the buildout of its quantitative trading strategies constitute (i) acquisition of a trade secret by an entity that knew or had reason to know that it was acquired by improper means and (ii) use of a trade secret without express or implied consent by an entity that used improper means to acquire knowledge of the trade secret and/or, at the time of use, knew or had reason to know that the knowledge of the trade secret was derived from a person who had used improper means to acquire the trade secret and/or acquired the trade secret under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret and/or was derived from or through a person who owed a duty to another to maintain the secrecy of the trade

16

secret or limit the use of the trade secret.  As such, its conduct constitutes misappropriation within the meaning of 18 U.S.C. § 1832.

70.    Centiva's misappropriation of Nebula's trade secrets was committed with the intention of and had the effect of causing Nebula injury.

71.    Centiva's misappropriation of Nebula's trade secrets has proximately caused damages to Nebula, including but not limited to lost profits, goodwill, competitive advantage, and business opportunities.

72.    Centiva has also been unjustly enriched by its misappropriation of Nebula's trade secrets.

73.    Centiva's misappropriation of Nebula's trade secrets was intentional, willful, wanton, reckless, and malicious, and warrants exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), as well as attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

**SECOND CAUSE OF ACTION**
**(Misappropriation of Trade Secrets, New York Common Law)**

74.    Nebula repeats and re-alleges each and every allegation contained in paragraphs 1 through 73 of the Complaint, as if fully set forth herein.

75.    Nebula's trade secrets include, as described above, software, vetted data sets, algorithms, simulation data,  and/or profit and loss information.  Those trade secrets are closely guarded and derive both actual and potential economic value from their confidentiality. They thus constitute trade secrets pursuant to New York common law.

76.    At all relevant times, Nebula has taken reasonable measures to protect the confidentiality of its trade secrets described above.

77.     Centiva received the Nebula trade secrets from Mr. McCarthy and relied upon Nebula's trade secrets to build its quantitative trading strategies and did so knowingly and without Nebula's express or implied consent.

78.     Centiva knew that Mr. McCarthy had legal duties and obligations prohibiting him from disclosing or using Nebula's trade secrets.

79.     Centiva's receipt of Nebula's trade secrets from Mr. McCarthy and reliance on the Nebula trade secrets for its quantitative trading strategies constitutes misappropriation under New York common law.

80.     Centiva's misappropriation of Nebula's trade secrets was committed with the intention of and had the effect of causing Nebula injury.

81.     Centiva's misappropriation of Nebula's trade secrets has proximately caused damages to Nebula, including but not limited to lost profits, goodwill, competitive advantage, and business opportunities.

82.     Centiva has also been unjustly enriched by its misappropriation of Nebula's trade secrets.

### THIRD CAUSE OF ACTION
**(Tortious Interference, New York Common Law)**

83.     Nebula repeats and re-alleges each and every allegation contained in paragraphs 1 through 82 of the Complaint, as if fully set forth herein.

84.     The employment agreement between Mr. McCarthy and NRD GP, and the Limited Liability Agreement whose terms were incorporated into that employment agreement and that Mr. McCarthy had signed, constitute valid and enforceable contracts supported by adequate consideration.

85.     Centiva was aware of those agreements and the confidentiality obligations that they imposed on Mr. McCarthy.

86.     Centiva was aware that those contracts prohibited Mr. McCarthy's disclosure or use of Nebula's trade secrets, yet intentionally and successfully induced Mr. McCarthy's breach of those obligations, including by providing him with direct financial consideration in the form of a salary paid by Centiva to Mr. McCarthy after the commencement of his employment.

87.     As a direct and proximate result of Centiva's intentional interference, Nebula has sustained and will sustain direct and indirect damages, including special and consequential damages.

88.     Centiva's conduct was intentional, willful, wanton, reckless, and malicious, and warrants exemplary damages.

## FOURTH CAUSE OF ACTION
### (Unfair Competition, New York Common Law)

89.     Nebula repeats and re-alleges each and every allegation contained in paragraphs 1 through 88 of the Complaint, as if fully set forth herein.

90.     In engaging in the conduct described above, including the misappropriation of Nebula's trade secrets and the inducement of Mr. McCarthy's breaches of contract, Centiva has misappropriated the results of the labor, skill, and expenditure of Nebula and thereby engaged in unfair competition.

91.     This misappropriation was done in bad faith and represents Centiva's exploitation of commercial advantage that had belonged exclusively to Nebula and thus constitutes unfair competition.

19

92.     As a direct and proximate result of Centiva's unfair competition, Nebula has suffered, continues to suffer, and will suffer in the future damages in an amount to be proven at trial.

93.     Centiva committed its actions knowingly, deliberately, and willfully in disregard of Nebula's rights.

94.     Accordingly, Nebula is entitled to recover punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Contract, New York Common Law)

95.     Nebula repeats and re-alleges each and every allegation contained in paragraphs 1 through 94 of the Complaint, as if fully set forth herein.

96.     ███████████████████████████████████████████████████████ ███████████████████████████, Centiva breached the express terms of the NDA it had entered into with Nebula.

97.     Centiva's breach of the NDA caused harm to Nebula in that Centiva converted Nebula's confidential information for purposes of evaluating the benefit of hiring Mr. McCarthy and engaging in the misconduct alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Enter an order permanently enjoining Centiva, and all persons and/or entities acting on its behalf, for its benefit, or in active concert or participation with it (including any agents, representatives, associates and/or employees), from disclosing or using any of Nebula's trade secrets or other confidential or proprietary information;

B.    Enter an order directing Centiva to account for and pay Nebula all gains, profits, and advantages derived by Centiva from the above-described unlawful acts;

C.    For an award of monetary damages sustained by Nebula as a result of Centiva's unlawful conduct, in an amount to be proved at trial;

D.    For an order enhancing such award and for punitive damages because of Centiva's willful and deliberate wrongdoing described herein;

E.    For an award of costs in this action and the reasonable attorneys' fees incurred by Nebula; and

F.    For an award of such other and furth relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Dated:  September 23, 2024                    Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Douglas R. Nemec
Patrick G. Rideout
Julie E. Cohen
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
douglas.nemec@skadden.com
patrick.rideout@skadden.com
julie.cohen@skadden.com

*Counsel for NRD GP LLC and
Nebula Research & Development LLC*

22