UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___9/30/2025___

NRD GP LLC, et al.,

                                        Plaintiffs,

                    -against-

CENTIVA CAPITAL, LP,

                                        Defendant.

24-CV-07245 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs NRD GP LLC and Nebula Research & Development LLC (collectively, "Nebula") bring claims against Defendant Centiva Capital, LP ("Centiva") for violation of the Defend Trade Secrets Act ("DTSA"), misappropriation of trade secrets, tortious interference, unfair competition, and breach of contract. Before the Court are two motions by Centiva: (1) a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim; and (2) a motion to compel the production of certain communications over which Nebula has asserted privilege. For the reasons that follow, the motion to dismiss is DENIED, and the motion to compel is GRANTED in part and DENIED in part.

## RELEVANT FACTS[1] AND PROCEDURAL HISTORY

This is an action between two competing investment management firms concerning the alleged misappropriation of confidential information pertaining to trading strategies. *See generally* Dkt. No. 1 ("Complaint" or "Compl."). Nebula was founded in 2018 by Michael Graves, who ran the firm until his untimely death in January 2022. *Id.* ¶¶ 1–2, 8, 23. The claims

---

[1] The following facts are taken from the allegations in the Complaint and are assumed true for the purpose of resolving the motion to dismiss.

in this case stem from the alleged conduct of non-party Colin McCarthy, a former high-ranking Nebula employee and minority equity owner who was terminated in May 2022 after control of the firm passed to Mr. Graves' estate. *Id.* ¶¶ 11, 25–29. According to Nebula, following the death of Mr. Graves, McCarthy stole Nebula's trade secrets—including software, algorithms, and data sets—as part of a concerted effort by Centiva to unlawfully recreate Nebula's quantitative trading strategies. *Id.* ¶¶ 2–7, 58.

Nebula filed this action on September 25, 2024. *See* Dkt. No. 1. Centiva moved to dismiss the complaint on November 4, 2024, *see* Dkt. No. 18 ("MTD Br."), and the parties proceeded with discovery while the motion was pending, *see* Dkt. No. 34. On July 8, 2025, just before the close of fact discovery, Centiva filed a letter motion to compel the production of certain documents. *See* Dkt. No. 52 ("MTC Letter"). The Court thereafter received from Nebula the disputed documents for *in camera* review. *See* Dkt. No. 59.

## DISCUSSION

## I.    CENTIVA'S MOTION TO DISMISS

Centiva moves pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss the Complaint for lack of subject matter jurisdiction, arguing that the Complaint fails to adequately allege that Nebula's purported trade secrets meet the DTSA's interstate commerce requirement. *See* MTD Br. at 9–11. Centiva also moves to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim because the Complaint does not adequately plead the existence of a trade secret. *See id.* at 11–14. Both arguments are unavailing at the motion to dismiss stage, and the motion is denied.

### A. Legal Standards on a Motion to Dismiss

Dismissal under Rule 12(b)(1) is warranted where a federal court lacks constitutional or statutory power to adjudicate the case. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).[2] "The court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In making that determination, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

controverting presentation by the moving party."). However, the Court need not accept as true conclusory assertions. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 321 (2d Cir. 2021).

### B. The Complaint Adequately Alleges an Interstate Nexus

Centiva argues that the Court lacks subject matter jurisdiction because Nebula fails to allege that the purported trade secrets are "related to a product or service used in, or intended for use in, interstate or foreign commerce," as required by the DTSA. *See* MTD Br. at 8–11; 18 U.S.C. § 1836(b)(1). The Court disagrees. As an initial matter, "it is unclear whether the commerce element of the DTSA is, in fact, jurisdictional." *M&A Metals, Inc. v. Fina*, No. 21-CV-05570 (PKC), 2023 WL 2734794, at *3 (E.D.N.Y. Mar. 31, 2023). Regardless, the Complaint satisfies the commerce element because it alleges that the purported trade secrets related to Nebula's trading of securities in interstate or foreign commerce.

At the pleading stage, "little is needed to satisfy [the] interstate commerce requirement," but dismissal is warranted where the complaint fails to allege any fact supporting an interstate or foreign nexus. *Aira Jewels, LLC v. Mondrian Collection*, LLC, No. 23-CV-04510 (JLR), 2024 WL 1255798, at *3 (S.D.N.Y. Mar. 25, 2024) (dismissing DTSA claim where the plaintiff was a "small family jewelry business" and "all transactions and services apparently occur[ed] within the state"). Here, the Complaint identifies Nebula as "an asset management firm that manages trading and investments for large institutional hedge funds," and alleges that Nebula's trade secrets include various algorithms, datasets, and software that Nebula uses in the trading of securities. Compl. ¶¶ 8, 16–17. The Complaint specifically alleges that "U.S. equities, *global* equities, and futures trading" are the "areas covered by Nebula's trade secrets." *Id.* ¶ 48 (emphasis added). No particular incantation of words is needed, and at this stage, these allegations meet Nebula's low bar for alleging an interstate or foreign nexus. *See KCG Holdings, Inc. v. Khandekar*, No. 17-CV-03533 (AJN), 2020 WL 1189302, at *10 (S.D.N.Y.

4

Mar. 12, 2020) (noting that predictive models "used in trading around the United States and the world" satisfies the DTSA's interstate commerce requirement) (citing *United States v. Agarwal*, 726 F.3d 235, 244–51 (2d Cir. 2013)).

### C. The Complaint Sufficiently Alleges the Existence of Protected Trade Secrets

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it possessed a trade secret and (2) the defendant misappropriated the trade secret." *Talenthub Worldwide, Inc. v. Talenthub Workforce, Inc.*, No. 24-CV-06264 (LGS), 2025 WL 2578385, at *4 (S.D.N.Y. Sept. 5, 2025) (quoting 18 U.S.C. § 1836(b)(1)). The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information if (1) the owner thereof has taken reasonable measures to keep such information secret and (2) the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* (quoting 18 U.S.C. § 1836(b)(1)). Centiva argues that Nebula does not plead the existence of trade secrets with the required specificity.[3] *See* MTD Br. at 11–14. Again, the Court disagrees.

"Although there is no heightened pleading requirement on actions brought under the DTSA, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Aira Jewels, LLC*, 2024 WL 1255798, at *4. Thus, "[a]lleging the existence of general categories of confidential information, without providing any details to generally define the trade

---

[3] Centiva does not directly challenge that Nebula has adequately alleged the second element of trade secret misappropriation under the DTSA. In any event, Nebula has met its pleading burden as to that element.

5

secrets at issue, does not give rise to a plausible allegation of a trade secret's existence." *Sapir v.*

*Rosen*, No. 20-CV-06191 (RA), 2021 WL 4482277, at *5 (S.D.N.Y. Sept. 30, 2021) (quoting

*Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-CV-05540 (KBF), 2018 WL 557906, at *6 (S.D.N.Y.

Jan. 23, 2018).

Nebula has adequately alleged the existence of trade secrets.  The Complaint identifies

five categories of relevant trade secrets:

- Highly sensitive computer source code, byte code, and object code that comprises Nebula's automated trading system and is designed to manage a diverse long/short portfolio of thousands of publicly traded securities and to execute trades.

- Data sets that have been selected and identified by Nebula as having predictive power about the movement of securities' prices.

- Quantitative trading algorithms that are reflected in highly sensitive computer source code, byte code, and object code. These algorithms utilize the selected data sets to develop trading models, which are then combined to produce portfolios of securities, taking into account various constraints including risk and liquidity.

- Simulation results of various combinations of trading models that are used to identify combinations that produce high-return portfolios.

- Daily profit and loss information that is critical to evaluating the suitability of Nebula's quantitative trading strategies for clients, based on their expected return and risk tolerance.

Compl. ¶ 16.  Although Nebula identifies the trade secrets based on categories, the allegations

are leagues apart from the sorts of "nebulous descriptions at the highest level of generality" that

courts have held to be too vague to state a claim under the DTSA.  *Cartiga, LLC v. Aquino*, No.

24-CV-01014 (PAE), 2025 WL 388804, at *8 (S.D.N.Y. Feb. 4, 2025).  Obviously, a plaintiff

must describe its trade secrets in a categorical fashion to some degree, lest it reveal the very

information it seeks to protect.  *See Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, No. 23-

6

CV-09000 (PKC), 2024 WL 3835264, at *5 (S.D.N.Y. Aug. 14, 2024) ("[Plaintiff] is not

obligated to plead its trade secrets with such specificity that it 'reveals its secrets in the complaint

simply to prove that they exist.'") (quoting *Catalyst Advisors, L.P. v. Catalyst Advisors Invs.*

*Glob. Inc.*, 602 F.Supp.3d 663, 672 (S.D.N.Y. 2022)).  Generality proves fatal only where the

allegations fail to provide any details sufficient to define the trade secrets at issue, such as bare

references to "pricing information" with no specificity as to the applicable products, or a "mere

invocation of 'propriet[ar]y formulas and methods'" without an explanation of their purpose or

function.  *See Sapir*, 2021 WL 4482277, at *7.

      Here, Nebula defines the purported trade secrets with sufficient specificity to inform

Centiva of what it is alleged to have misappropriated.  Nebula therefore meets its burden to

allege the existence of trade secrets at the pleading stage of the case.  *See Zabit v. Brandometry,*

*LLC*, 540 F. Supp. 3d 412, 422–23 (S.D.N.Y. 2021) (denying motion to dismiss where the

plaintiffs defined their trade secrets as the "algorithms, proprietary formulas, patterns,

methodology, technical information, processes, programs, codes and compilation of information

used to develop, and which continue to underlie [certain stock indexes]," despite the court

characterizing the allegations as "rather broad and verg[ing] on overly-vague").  Contrary to

Centiva's suggestion, Nebula need not plead every part of the six-factor test[4] used in this Circuit

to determine whether information constitutes a trade secret under the DTSA.  *See Onyx*

---

[4] In determining whether information constitutes a trade secret, courts in this Circuit consider: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020).  "'These factors are guideposts, not elements,' and a plaintiff need not 'plead every single factor' for the relevant information to constitute a trade secret."  *Onyx Renewable Partners L.P. v. Kao*, No. 22-CV-3720 (RA), 2023 WL 405019, at *2 (S.D.N.Y. Jan. 25, 2023) (quoting *Iacovacci*, 437 F. Supp. 3d at 380).

*Renewable Partners L.P. v. Kao*, No. 22-CV-3720 (RA), 2023 WL 405019, at *2 (S.D.N.Y. Jan. 25, 2023).  Nor is it proper for the Court to entertain Centiva's factual arguments with respect to those factors, outside of the specificity analysis above.  *See id.* ("The question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss.").  Centiva's remaining arguments, including its attempts to factually distinguish its responsibility from that of its employee, *see* MTD Br. at 14, likewise carry no weight at this stage.  Accordingly, Centiva's motion to dismiss is denied.

## II.    CENTIVA'S MOTION TO COMPEL

Centiva contends that Nebula has improperly withheld or redacted 27 communications. *See* Dkt. No. 52 ("MTC Letter"); Dkt. No. 52-5.  The communications largely comprise strategic discussions at Nebula related to the allegations underlying this case.  The relevant individuals on the communications include: (1) Suzanne Graves, the widow of Mr. Graves who controls the trust which now controls Nebula; (2) Jim Barron, a public relations professional who provided services to Nebula; (3) Cynthia Barron, Mr. Barron's wife who is not herself a public relations professional; (4) and Vincent Ji, a recruiter who provided services to Nebula.  *See* MTC Letter at 1–3.  Nebula has asserted either attorney-client privilege, work product privilege, or both, over each of the contested documents.  Centiva contends that the communications are not privileged and should be produced.  It argues that Mr. Barron, Ms. Barron, and Mr. Ji were not assisting Nebula with litigation tasks and do not fall within Nebula's privilege.  Further, it posits that the communications will reflect the strategic efforts by Ms. Graves to "destroy Mr. McCarthy and now blacken Centiva's reputation" in furtherance of Ms. Graves' "deep animus" toward Mr. McCarthy, and, according to Centiva, will show that Nebula brought the instant lawsuit in bad

faith. *Id.* at 1.  After conducting an *in camera* review of the disputed documents, the Court determines that the majority of the documents are subject to discovery.

### A.  Legal Standard on a Motion to Compel

Federal Rule of Civil Procedure 26 provides, in relevant part, that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  "The burden of demonstrating relevance is on the party seeking discovery . . . [and] [o]nce relevance has been shown, it is up to the responding party to justify curtailing discovery." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (quoting *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011)).  The court has "broad discretion" in determining relevance. *Michael Kors, L.L.C. v. Su Yan Ye*, 18-CV-02684 (KHP), 2019 WL 1517552, at *2 (S.D.N.Y. Apr. 8, 2019).

Because Nebula's claim arises under federal law, the federal law of privilege applies. *Terpin v. Pinsky*, No. 20-CV-03557 (CS) (AEK), 2022 WL 3572928, at *2 n.1 (S.D.N.Y. Aug. 19, 2022) (noting the federal law of privilege applies in federal question cases, even where that plaintiff also brings state claims based on either diversity or supplemental jurisdiction).

### B.  Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). To determine whether the privilege applies, a court queries whether the communication was made to obtain or provide legal advice. *In re County of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). "Fundamentally, legal advice involves the interpretation and application of legal principles to

guide future conduct or to assess past conduct." *Id.*, 473 F.3d. 413, 419 (2d Cir. 2007).  The

party asserting privilege carries the burden to establish every element of privilege and to

establish that the privilege has not been waived.  *Oakley v. MSG Networks, Inc.*, No. 17-CV-

06903 (RJS), 2025 WL 307413, at *1 (S.D.N.Y. Jan. 27, 2025).

      "A party that shares otherwise privileged communications with an outsider is deemed to

waive the privilege by disabling itself from claiming that the communications were intended to

be confidential." *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015).  However, courts

recognize exceptions to the doctrine that any disclosure waives privilege.  For example, "an

agent, such as a financial advisor, may have communications with an attorney that 'are covered

by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give

effective advice by explaining financial concepts to the lawyer.'" *Urban Box Office Network,*

*Inc. v. Interfase Managers, L.P.*, 01-CV-08854 (LTS) (THK), 2006 WL 1004472, at *3

(S.D.N.Y. Apr. 18, 2006).  "This exception is commonly called the 'translator exception.'"

*United States v. Anthem, Inc.*, No. 20-CV-02593 (ALC) (KHP), 2025 WL 2426482, at *4

(S.D.N.Y. Aug. 22, 2025) (citing *United States v. Kovel*, 296 F.2d 918, 920–23 (2d Cir. 1961).

"The scope of this exception is not to be defined by a third party's employment or function, but

the party asserting the agency exception must show: (1) a reasonable expectation of

confidentiality under the circumstances, and (2) that disclosure to the third party was necessary

for the client to obtain informed legal advice." *Homeward Residential, Inc. v. Sand Canyon*

*Corp.*, 12-CV-07319 (JFK) (JLC), 2017 WL 4676806, at *5 (S.D.N.Y. Oct. 17, 2017).  "Some

Second Circuit district courts have also found that attorney-client privilege extends to third-party

agents where the third party 'is nominally not an employee—typically a consultant or a

contractor to the entity holding the privilege—but who is 'functionally equivalent' to an

employee.'" *Stanan Inc. v. Mt. Hawley Ins. Co.*, No. 24-CV-03975 (LGS), 2025 WL 343212, at

*1 (S.D.N.Y. Jan. 30, 2025) (quoting *Sec. & Exch. Comm'n v. Rayat*, No. 21-CV-04777 (LJL),

2023 WL 4420325, at *3 (S.D.N.Y. July 10, 2023)).  The Second Circuit has not addressed the

"functionally equivalent" exception, and some courts have expressed skepticism that the Second

Circuit would adopt it.  *See, e.g., In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust

Litig.*, 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019).  Nevertheless, courts that have applied the

exception:

> [H]ave looked to several factors to determine whether a person is the
> functional equivalent of an employee: whether the consultant exercised
> independent decision-making on the company's behalf; possessed
> information held by no one else at the company; served as a company
> representative to third parties; maintained an office at the company or
> otherwise spent a substantial amount of time working for it; and sought legal
> advice from corporate counsel to guide his or her work for the company.

*Rayat*, 2023 WL 4420325, at *3 (quoting *In re Restasis*, 352 F. Supp. 3d at 213).

### C.  Work Product Doctrine

"Under Fed. R. Civ. P. 26(b)(3), a document created 'because of' the prospect of

litigation 'which tends to reveal mental impressions, conclusions, opinions or theories

concerning the litigation' receives limited protection from disclosure under the attorney work

product privilege."  *Bonacasa v. Standard Chartered PLC*, No. 22-CV-03320 (ER), 2025 WL

1380079, at *3 (S.D.N.Y. May 12, 2025).  "The key factor in determining applicability of this

doctrine is whether the documents or things were prepared 'with an eye toward' or 'in

anticipation of' or 'because of the prospect of litigation.'"  *Urthtech LLC v. Gojo Indus., Inc.*,

No. 22-CV-06727 (PKC) (KHP), 2024 WL 3898179, at *4 (S.D.N.Y. Aug. 26, 2024) (quoting

*Hickman v. Taylor*, 329 U.S. 495, 510–511 (1947)).  "The doctrine is not satisfied merely by a

showing that the material was prepared at the behest of a lawyer or was provided to a lawyer.

Rather the materials must result from the conduct of 'investigative or analytical tasks to aid

11

counsel in preparing for litigation.'" *Id.* (quoting *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-03923 (DRH) (AKT), 2017 WL 1233842 (E.D.N.Y. Mar. 31, 2017)).

"As a general matter, public relations advice, even if it bears on anticipated litigation, falls outside the ambit of protection of the so-called 'work product' doctrine embodied in Rule 26(b)(3)." *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg, New York,* 171 F. Supp. 3d 136, 142 (S.D.N.Y. 2016) (quoting *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). "That is because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally." *Calvin Klein*, 198 F.R.D. at 55.

Unlike the attorney-client privilege, disclosure of attorney work product results in waiver "only when the disclosure is to an adversary or is made in a manner that materially increases the likelihood of disclosure to an adversary." *New York v. Mayorkas*, No. 20-CV-01127 (JMF), 2021 WL 2850631, at *6 (S.D.N.Y. July 8, 2021) (quoting *Sec. & Exch. Comm'n v. Beacon Hill Asset Mgmt. LLC*, 231 F.R.D. 134, 146 (S.D.N.Y. 2004)). "No waiver occurs where work product is disclosed to public relations consultants who intend to keep the information in confidence." *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 436 (S.D.N.Y. 2013); *see also William A. Gross Const. Ass'n Inc. v. Am. Mfrs. Mut. Ins. Co.*, 262 F.R.D. 354, 361 (S.D.N.Y. 2009) ("[W]here work product is disclosed to a third party, the claim of work product protection may be maintained if the third party is aligned in interest with the author of the work product.")

The protections of Rule 26(b)(3) sweep more broadly, and also may be more easily overcome, than traditional notions of attorney work product privilege. As noted above, Rule 26(b)(3) allows a party to withhold documents prepared in anticipation of litigation or trial, even

if they were not prepared by an attorney, so long as they were prepared by a party or its representative, which the Rule specifically defines as "including the other party's attorney, consultant, surety, indemnitor, insurer, or agent." Fed. R. Civ. P 26(b)(3)(A). Consistent with the common law attorney work product doctrine, the protection offered by the Rule can be overcome if the requesting party "shows it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The Rule goes on to caution that, if a court orders disclosure of materials that otherwise fall within the Rule, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

"The party asserting work product protection must demonstrate that the material at issue (1) is a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative." *Von Kahle v. Cargill, Inc.*, 599 F. Supp. 3d 181, 186 (S.D.N.Y. 2022).

### D. Relevance

Documents that are not protected by a privilege are subject to discovery so long as they are relevant and discovery is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. It is well established that the bar for relevance is low. *See United States v. Garnes*, 102 F.4th 628, 638 (2d Cir. 2024) (describing relevance as a "low threshold, easily satisfied") (quoting *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019)); *Zama Cap. Advisors LP v. Universal Ent. Corp.*, 24-CV-01577 (MKV), 2025 WL 968783, at *30 (S.D.N.Y. Mar. 31, 2025) ("The standard for relevant evidence is quite low."); *United States v. Gilmore*,

No. 19-CR-00724 (JGK), 2021 WL 4151009, at *2 (S.D.N.Y. Sept. 13, 2021) ("The standard for relevance is a low one.").

### E. The Disputed Communications

As an initial matter, all of the disputed communications are relevant. They plainly concern the alleged facts of this case and tend to make at least some of those facts more or less probable. Moreover, the facts are of consequence in determining the action. Most notably, the documents reflect the beliefs and motivations of likely witnesses, including Ms. Graves, which are highly relevant to evaluating bias and witness credibility with respect to the alleged conduct of McCarthy and Centiva and its alleged effects on Nebula. Further, as the burden of producing this small set of documents (already reviewed by counsel) would be low, production is proportionate to the needs of the case. Accordingly, the discoverability of the disputed documents depends on whether Nebula's assertions of various privileges are valid, which the Court determines below.

### 1.    Privilege Log Entry No. 1136

Document 1136 is an email chain originating from Henry Bregstein on May 10, 2022, over which Nebula asserts attorney-client privilege. Bregstein, an attorney, advises Suzanne Graves regarding a non-disclosure agreement, and Graves forwards the message to certain Nebula personnel and to Vincent Ji, an executive search professional at NoConcept Partners, LLC. The translator exception within attorney-client privilege does not apply because there is no indication that disclosure to Ji was necessary for Ms. Graves or Nebula to obtain informed legal advice. Indeed, the email was disclosed to Ji one month after the legal advice had already been rendered and when Bregstein was no longer on the email chain. Assuming the functional equivalence exception is valid in this Circuit, Nebula has not met their burden to show that Ji was the functional equivalent of a Nebula employee. Nebula asserts that "Mr. Ji has a

sufficiently close relationship to Nebula due to his trusted guidance with recruiting and finding a client, and here he is helping with legal strategy on Nebula's behalf." Dkt. No. 54 ("MTC Opp.") at 3. But nothing in the document suggests that Ji was helping with legal strategy, and Nebula has not shown that Ji "played such [an] exceptional role[] at [Nebula] that [he] should be treated as anything other than [a] typical part-time consultant[]." *In re Restasis*, 352 F. Supp. 3d at 214; s*ee also In re Allergan plc Sec. Litig.*, No. 18-CV-12089 (CMG) (WG), 2021 WL 4121300, at *9 (S.D.N.Y. Sept. 9, 2021) ("[C]orporations commonly engage in conduct that involves legal risks. A corporation's discussion of such matters with a consultant does not result in the consultant being magically converted into the functional equivalent of an employee of the corporation."). Accordingly, Document 1136 is not privileged and must be produced.

### 2. Privilege Log Entry No. 1545

Document 1545 is a November 28, 2022, email from Suzanne Graves to Cynthia Barron and a related attachment, over which Nebula asserts work product protection.[5] Although Cynthia Barron is the only recipient, the email's salutation reads "Reed & Henry". "Henry" possibly refers to Henry Bregstein, the attorney from Document 1136, and the subject line "2nd draft" suggests that Ms. Graves may have been working with Ms. Barron to craft an email to counsel. The email primarily concerns legal strategy regarding the alleged misconduct by McCarthy, and the attachment primarily concerns related facts. While the document does not appear to be within attorney-client privilege, Nebula does not claim that it is. Rather, Document 1545 was properly withheld as attorney work product. Although there is no clear indication that an

---

[5] Nebula argues that Centiva has waived any objection to documents withheld on work product grounds, as their letter-motion only directly addresses attorney-client privilege claims. At best, the letter-motion is unclear. For efficient resolution of this dispute, the Court will address whatever basis for non-disclosure Nebula has claimed in its privilege log or opposition.

attorney prepared the document, the work product doctrine is not limited to work directed by an attorney. *Shih v. Petal Card, Inc.*, 565 F. Supp. 3d 557, 574 (S.D.N.Y. 2021). Document 1545 clearly is (1) a document or tangible thing that (2) was prepared in anticipation of litigation (3) by or for a party. *See id.* Disclosure to Ms. Barron did not waive the protection because Ms. Barron was aligned in interest with Ms. Graves, and disclosure to Ms. Barron did not materially increase the likelihood of disclosure to any adversary. And while the document may be relevant to public relations strategy, it chiefly is concerned with strategy about the litigation itself. Accordingly, it may properly be withheld.

### 3. Privilege Log Entry No. 1931

Document 1931 is a July 16, 2024, email from Suzanne Graves to Jim Barron, attaching a draft complaint against Centiva, over which Nebula has claimed both attorney-client privilege and work product protection. First, the email is not privileged. Notably, the communication does not include an attorney, and Nebula does not appear to contend (or at the very least have not shown) that either Cynthia or Jim Barron was an agent of an attorney. Nor do they show that Jim Barron was the functional equivalent of an employee. Nebula cites *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213 (S.D.N.Y. 2001) to support the proposition that communications with a public relations consultant are privileged where the consultant assists with legal strategy. MTC Opp. at 2. But there, the court found that a public relations firm acted as "the functional equivalent of an in-house public relations department" for a Japanese company where it had authorization to make decisions on the company's behalf with respect to Western media relations and sought advice from corporate counsel to formulate a public relations strategy. *See In re Copper Market Antitrust Litig.*, 200 F.R.D. at 216, 219. The corporation did not have experience in dealing with Western media and retained the outside firm to deal with Western press, while its internal corporate communications department dealt with Japanese press. *Id.* at 215–16. The

court emphasized that the public relations firm "was, essentially, incorporated into [the corporation's] staff to perform a corporate function that was necessary in the context of [a] government investigation, actual and anticipated private litigation, and heavy press scrutiny obtaining at the time," and that its communications with counsel concerned matters within the scope of the outside firm's duties for the corporation and "were for the purpose of obtaining legal advice." *Id.* at 219.

The unique relationship that existed in *In re Copper Market* does not exist here, and Nebula has failed to demonstrate any of the factors which courts usually use to determine whether a third party is the functional equivalent of an employee. *See In re Restasis*, 352 F. Supp. 3d at 213. Essentially, Nebula seeks to apply the functional equivalence exception wherever a consultant assists with matters that implicate legal issues. Assuming that the functional equivalence exception is even valid, adopting Nebula's position would expand the scope of attorney-client privilege far beyond the limits recognized in this Circuit. *See Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-00585 (AJN), 2014 WL 7238354, at *3 (S.D.N.Y. Dec. 19, 2014) ("Applying the equivalent function exception to the facts here would swallow the privilege waiver rule and would extend the attorney-client privilege to communications with any third party who was hired to assist the client with something the client could not do on its own.").

However, the attached draft complaint is protected attorney work product. There is no waiver because the disclosure to Jim Barron was not made in a manner that materially increased the likelihood of disclosure to an adversary. Accordingly, the email must be produced but the attachment can be withheld.

17

4.    **Privilege Log Entries 1932, 1933, 1934, 1938, 1941, 1949, 1950, 1951, 1952, 1954, and 1955**

Documents 1932, 1933, 1934, 1938, 1941, 1949, 1950, 1951, 1952, 1954, 1955 comprise a series of emails dated July 23 to September 13, 2024, among Jim Barron, Suzanne Graves and other personnel from Nebula and FGS Global ("FGS"), which appears to be Jim Barron's firm. Nebula asserts attorney-client privilege over 1932, 1938, 1941, 1949, 1950, 1951, 1952, 1954, and 1955; and work product protection over all of the emails discussed in this section.  The emails discuss the rollout of a media strategy related to Nebula's anticipated lawsuit against Centiva.  Attached to the emails are several iterations of a "Nebula Research Media Strategy" and other media research materials.  For the reasons stated above, the emails are not privileged. Additionally, the attached media strategy documents are not protected by the work product doctrine.  While they undoubtedly relate to anticipated litigation, the documents primarily, if not exclusively, concern strategy about the anticipated litigation's effect on public opinion, not legal strategy pertaining to the litigation itself.  *See Rapp v. Fowler*, No. 20-CV-09586 (LAK), 2021 WL 4804096, at *2 (S.D.N.Y. Oct. 13, 2021) (rejecting claim of work product protection where the documents "were not generated primarily for litigation but instead reflect a discussion of public relations strategy"); *Calvin Klein*, 198 F.R.D. at 55 ("[T]he purpose of the [work product doctrine] is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally.").  Accordingly, the documents in this set must be produced.

5.    **Privilege Log Entries 1942 and 1943**

Documents 1942 and 1943 are two emails dated September 10, 2024, between Suzanne Graves and Jim Barron, attaching draft letters from Nebula's attorney to an attorney at Centiva. The draft letters are protected by the work product doctrine and may properly be withheld.

6.    **Privilege Log Entry 1968**

Document 1968 is a September 22, 2024, email from Suzanne Graves to Nicholas Rust of FGS, copying Jim Barron and other personnel from Nebula and FGS and attaching a "Media Pitch Note." A prior email in the same thread contains Nebula's attorneys. Nebula asserts both attorney-client and work product privilege over the email. The mere fact that an attorney is copied on the email does not transform its content into one that can satisfy the demands of attorney-client privilege, and this email falls outside of those standards. And for the reasons stated above with respect to Documents 1932, 1933, 1934, 1938, 1941, 1949, 1950, 1951, 1952, 1954, and 1955, the Media Pitch Note is not protected by the work product doctrine. This document must be produced.

7.    **Privilege Log Entries 1969, 1974, 1976, 1977, 1981, 1983, 1984, 1985, and 1986**

Documents 1969, 1974, 1976, 1977, 1981, 1983, 1984, 1985, and 1986 comprise a series of emails from September 22–24, 2024 among Suzanne Graves, Nebula's attorneys, and personnel from FGS and Nebula. Nebula asserts both attorney-client and work product privilege over all of the emails. None of the emails are privileged, for the reasons stated above. However, 1976 and 1977 are appropriately withheld within work product protection, at least because they reflect attorney opinions and mental impressions about litigation strategy that were shared only with those unlikely to disclose to an adversary. On Document 1981, the top email in the chain from Nicholas Rust to others at 9:03 pm on September 24, 2024, is not within work product protection but the balance of the document can be redacted on the basis of work product for the same reasons as Documents 1976 and 1977. Similarly, on Document 1983, the top two emails— the one discussed above for 1981 and the one above it from Suzanne Graves at 9:55 pm on September 24, 2024—fall outside the work product protection and should be produced; the

balance of the document can be redacted.  On Document 1984, the only portions that can be

redacted for work product, as reflecting attorney opinions or strategic views about the litigation

(as opposed to media or public relations strategy) are the email from Douglas Nemec at 4:06 pm

on September 23, 2024, the email from Douglas Nemec at 3:34 pm on September 23, 2024, the

email from Prasanna Kannan at 11:10 am on September 24, 2024, and the email from Douglas

Nemec at 10:14 AM on September 24, 2024.  The balance of Document 1984 should be

produced.  The same redactions, for the same reasons, can be applied to Documents 1985 and

1986, with the balance of both documents produced.

### 8.    Privilege Log Entry 1957

Document 1957 has been produced and is no longer in dispute.

### CONCLUSION

For the foregoing reasons, Centiva's Motion to Dismiss is DENIED and Centiva's

Motion to Compel is GRANTED IN PART and DENIED IN PART.  By no later than October

14, 2025, Nebula shall produce the disputed documents in the manner and to the extent directed

by the Court herein.  Finding that the Nebula's positions were good faith litigation positions in a

complex area, the Court declines to impose sanctions or fees.

The Clerk of Court is respectfully directed to terminate Dkt. Nos. 17, 52, and 56.


Dated: September 30, 2025
       New York, New York


SO ORDERED.

MARGARET M. GARNETT
United States District Judge